The Honorable the Judges of the United States Court of Appeals for the Fourth Circuit. Good afternoon. We're ready to hear argument in Peters v. Aetna et al. Mr. Hufford, we'll be glad to hear from you. Thank you, Your Honor. May it please the Court, I am Brian Hufford from Zuckerman Spader on behalf of Appellant Sandra Peters. Ms. Peters' husband is an employee of Mars, Inc. As part of the compensation he received as an employee benefit, the right for his family, including Ms. Peters, to be insured under the health insurance plan issued by Mars and governed by a risk. The health insurance policy is self-insured. As a result, benefits under the health insurance plan are paid out of the assets of Mars. Like many employers in self-insured plans, Mars does not administer its own health insurance plan. It hired what is known as a third-party administrator. Here Mars hired Appellee Aetna as the claims administrator and paid it a set administrative fee, a set amount per member per month. Aetna was paid as the claims administrator to build a network of health care providers with negotiated discounted rates to provide health care services to the plan beneficiaries. Aetna was also paid through the administrative fee to process the claim for benefits by determining what portion of the medical expenses to be paid by the plans that Aetna administered, including Mars, and what portion would remain the financial responsibility of the beneficiary. Counsel, I think the panel is going to be fairly familiar with the facts, and you can interweave those as you want, but you've got several issues, so you may want to go directly to those. Okay. Thank you, Your Honor. The key issue here is what happened in the relationship once Aetna was retained as a claims administrator. It subcontracted with Optum Health to basically for Optum to provide claims administrative services with regard to physical therapy and chiropractic services. In a sense, Aetna was being paid as a claims administrator to process all the claims, to set up a network for all providers, and to process those claims. It then delegated a portion of that responsibility to Optum to do that same thing. And the question is, how is the Optum fee going to be handled? This case is about how Optum and Aetna process the claims. It's about the self-serving way that Aetna interpreted the written terms of the Mars plan, which are found in the summary plan description of JA 3000. The plain meaning of these written terms under ERISA and common sense make clear that the Mars plan is intended to cover only the medical expenses for claims submitted by qualified healthcare professionals. That's the entire purpose of a health insurance plan to cover medical expenses. Yet Aetna interpreted those written terms to mean that the Mars plan and Ms. Peters had to also pay Optum's administrative fee. In other words, the fee that Aetna agreed Optum should receive for serving as a subcontracting claims administrator. The result is the plan paid Aetna to set up a network of PT and chiropractic providers and process the claims, and then had to pay Optum again for doing the same thing. The key document in many ways here is the explanation of benefits, which is a form put out by Aetna. I'm sorry, Mr. Hufford. I need to back up a little bit to standing. What is appellant's stake in the lawsuit here? Ms. Peters, well, first of all, there's two different ways to look at it. Under the Pender case, Pender versus Bank of America, a beneficiary and plan can pursue an action for breach of where there is a fiduciary profits from that breach, even if the plan and beneficiaries don't have a financial loss. And in this case, we're arguing that Aetna incurred breaches fiduciary duties. Okay, do you concede that Ms. Peters would not have a financial loss? No, your honor. I was saying even without it, she would testify. But moreover, she has a financial loss. Each time Aetna processed the claims, she was assessed her co-insurance based on the increased fee that was intended to apply to Optum, rather than the actual negotiated fee of her treating provider. That meant she paid too much. In fact, in the brief, we show that she overall was charged more than $300, more than she should've been charged had the plan been properly assessed. What is your basis for Aetna, not Optum, but Aetna's liability here? Do you say they are a named fiduciary, or a functional fiduciary, or some of both, or neither? The plan formally names Aetna as a claims administrator. And the plan also specifies that as the claims administrator, it gives discretion to Aetna to process the claims, make benefit decisions, and handle the appeals. So it actually is, in fact, a named fiduciary because it's identified in the plan as the claims administrator with that authority. But moreover, in practice, it's the same thing. Because Aetna makes the claim determination. It processes the claim. It determines how much the benefit is issued, how much should be paid by the plan, and how much should be paid by the beneficiary. An argument in this case is, in doing that, Aetna acted in effect fraudulently by hiding the fact that it was treating the Optum administrative fee as if it was a medical expense. Now, I think that can be shown best through the EOB itself. And again, the explanation of benefit processes the claim and is issued by Aetna once a claim is submitted. At JA-3146 is an example in the joint appendix of that EOB. Moreover, and I think this highlights how significant this claim is, that EOB is repeated in the American Medical Association's amicus brief at page 7. That EOB starts with listing the provider as being Optum Healthcare. But Optum is not a medical provider. Optum was a claims administrator that it subcontracted with Aetna. And one thing that really shows that is if you look at the plan, the plan terms defines Aetna as a claims administrator, and then it defines what Aetna is. And in defining Aetna, the plan says Aetna is Aetna Health Insurance Company and any third-party vendor. The third-party vendor is Optum. Optum, therefore, is under the plan part of Aetna. It's part of the claims administrator services. So it's improper for Aetna to identify Optum as a provider. So then you look at what the process in the claim in this EOB. It first lists a chiropractic manipulation service with a $40 bill charge with CBT code 98940. That service is what actually was provided by Dr. St. Schaefer, which is the chiropractor that Ms. Peters actually saw. And that bill, 98940, reflects the one service she actually received, chiropractic services. In fact, in the bill that was submitted by Dr. Schaefer to Optum, which is a JA5701, that is the only bill that was submitted by that provider. Now, interestingly enough, the EOB doesn't So let me make sure that I'm clear on the causes of action that you assert and say survive. If it turns out, for instance, that Ms. Peters, for whatever reason, was found not to have a direct injury, in other words, that her personal monetary losses ended up not being a loss, is it your argument, for instance, that the explanation of benefits, if it's inaccurately or falsely stated, is that a separate ERISA cause of action? Yes, because it's a deception or in effect a fraud by Aetna because the information it has on here was inappropriate. And that really comes from the second item. But this also shows, I think I can show you there's actual injury here. Because other than the CPT code for the chiropractic service, which again, is the only service she received, there's a second CPT code included on this EOB. And a CPT code is a five-digit number that is used to design each individual healthcare service. The American Medical Association owns and licenses that service, that CPT code. The second CPT code listed on the EOB is an unlisted modality, 97039. Now, that modality is the AMA reflected in its amicus brief, is designed to reflect an actual modality or a physical treatment for the patient. Ms. Peters did not receive that service and no provider billed for that service. It was put in there by Aetna to hide the administrative fee for optum. By using that CPT code, Aetna improperly reflected that as a medical expense. And the American Medical Association in the amicus brief made that eminently clear, stating that was in fact a misleading and fraudulent use of the CPT code. Now, here's where this... So was that, the placement of the CPT code, was that the act of Aetna, the act of optum, or a joint act? It actually was a joint act. Aetna was the one that put it in the EOB. It was a joint act in the sense of when Aetna contracted with optum, Aetna reflected the fact that it did not want to have to pay this out of its own administrative fee. Because remember, it was already paid to provide, to set up a network and to process the claims. It then hired optum to do that, subcontracted for PT services and for chiropractic services. So it did not want to have to pay that out of its own assets. So it hid that as a medical expense, but it contracted with optum and required optum to be paid that way. And in fact, as reflected in our briefs, in many cases, optum didn't like it. It didn't want to do it, but it was forced to do it by Aetna in order to get the business. Now, what's significant about this, and this goes to the financial injury from his Peters. If you look at the EOB, the amount that's identified as the allowed amount is from this Again, which is improperly characterized as a medical expense. It shows it as being $70.89. Under the plan, Mars is supposed to pay 80% of the negotiated charge, while Ms. Peters is supposed to pay 20%. The actual negotiated charge in this case was $34. That's reflected in a remittance advice that optum sent to Dr. Schaefer for the service that Ms. Peters actually received at JA 5705. So Dr. Schaefer negotiated to accept $34 for manipulation. Under the plan, the plan was supposed to pay 80% of the $34, or $27.20, while Ms. Peters was supposed to pay 20%, or $6.80. But instead, Aetna applied this to the $70.89. So Ms. Peters was actually overcharged by $7.38 for this one single claim. Instead of having to pay $6.80 of her 20% co-insurance, she had to pay $14.18. Ms. Hubbard, for purposes of class certification, I understand your common contention, but is there a common injury? Yes, Your Honor, because this exact process happened over and over again. In our expert report from Dr. Panis, he goes through and analyzes the claims data. What happened here is that Aetna had this exact same process. Every time the claim came in for PT or chiropractic, Aetna would add in an extra charge to reflect an administrative fee by optum. It had nothing to do with an actual medical expense. And then when it assessed the benefits to be paid by the plan, or the co-insurance to be paid by the beneficiary, it would apply that toward the increased administrative fee cost and not to the reduced negotiated charge of the treating provider. So this happened across the board to scores of patients and to scores of plans in exactly the same way. And that's why we believe that it's a very simple class certification issue. What's the basis of optum's liability? Well, I'll be up front here, but in reality, Aetna is the only one that really needs to be held liable. Optum is liable because it was part of the plan. We view it as being a fiduciary also, but the district court disagreed with us. Because it's processing the claim, it knew what was going on and it contributed to it. And it was in fact a party in interest under ERISA, which meant that it was part of the prohibited transaction of using the plan assets to pay optum rather than to pay for the beneficiary. It may have been a party in interest, but what's the basis for holding it to be a fiduciary for ERISA purposes? It seems to me more of a third party vendor, like somebody you would buy office supplies from in some senses as opposed to a fiduciary, which doesn't mean the third party vendor can't enter into an illicit agreement with a fiduciary. But it seems like the basis for holding it liable as a fiduciary is fairly weak. Well, I guess I would start by saying we don't need optum to be found liable itself. Aetna is the one who came up with this idea. It's the one that was unjustly enriched. We think optum can also be held responsible because it did in fact was involved in making benefits. It processed the claims. It did the utilization review and determined what was or was not medically necessary. So for that, it could be brought in as a fiduciary, but again, we don't need that. For the liability here, it really ultimately is Aetna because Aetna is the one who was unjustly enriched. And again, in looking at what was appropriate remedy under ERISA, the classic type of remedy is disgorgement when a faithless fiduciary ultimately is unjustly enriched because of a fiduciary breach. In this case, Aetna clearly is a fiduciary. It was supposed to process the claims properly. It had already been paid once for its administrative fees. In a sense, Mars had already paid it an administrative fee to set up a network of PT and chiropractic services and to process those claims. So when Aetna subcontracted with optum and then tried to force Mars as well as Ms. Peters to pay for that, it really was forcing them to pay twice. So Aetna should have been responsible for paying for optum because it came out of its own control. It was therefore unjustly enriched by the amount that the plans and the providers and the insurers, including Ms. Peters, had to pay. And that could easily be calculated. Mr. Hufford, you've gone over a little bit, but you've got time left on rebuttals. So why don't we hear from Mr. Austin. Thank you, Your Honor. Yes, thank you, Your Honor. Earl Austin, I represent Aetna. In our view, this is a fairly simple case. Aetna contracted with optum for the simple reason that optum had a network of providers that was superior to Aetna's in the specialties that we're talking about. And Aetna negotiated a flat rate for access to those group of providers. There was no evidence or even really any allegation that the flat rate itself was excessive or not consistent with the market. And there was two indicia there. First, it was clear, it would seem to be, who's supposed to pay that? Aetna or the plan and the plan participant? Sure. But the choice here, and I do need to make this point, the reason that Aetna did this is because Aetna's rates were already higher. So, for example, just to give one concrete example, in the Carolina region, the rates, the average rates under Aetna's network were $109 for a physical therapist. The rate Aetna was able to negotiate with optum was $88. And their only complaint is that we didn't charge the rate that optum ultimately paid the downstream provider. But there was no evidence that Aetna could have ever negotiated for that rate. The only evidence was that we negotiated a rate that objectively was 25-35% less than Aetna's own network would have provided the same service. Well, some opposing counsel would say that that's what Mars was paying Aetna to do was to go out into the marketplace and find the lowest price providers and to offer those to the plan, and that's why Mars hired them. Correct. And in negotiating with optum, this was completely consistent with that. Aetna, for example, may negotiate with a hospital, and the hospital will have a bunch of downstream rates, and Aetna will negotiate a fixed fee for that. Built into that will be some administrative costs that the hospital would incur. A physician group would be the same way. In other words, Aetna will often negotiate with collectives of providers. They'll negotiate with a central billing office or administrative office, but it will be negotiating for the downstream rates, and it will negotiate a fixed rate for that. This was no different. We simply negotiate a fixed rate for access to contracts that optum had through its network, and the rate that we negotiated was much less than would have been available under Aetna's. And the record also showed that in 30% of the cases, it was actually less than optum had paid the downstream provider. And I think if you look at the plan document, which obviously Aetna is given discretion as a plan, as a claims administrator to interpret the plan documents. In the plan documents, there were two types of providers, two classes, network providers and out-of-network providers. And in every sense, being a network provider was a more favorable posture for patients or for plan participants. If a provider was classified as an out-of-network provider, there were more restrictions on their use, and they were much more expensive. For example, had optum, these providers been classified as out-of-network providers, Ms. Peters would have paid instead of the 20% co-insurance, she would have paid a 50% co-insurance. As I take opposing counsel's argument, he doesn't dispute the business arrangement that's made, but that using the terms of the plan, that optum could not be a healthcare provider, and that the charge that the plan set for a plan participant to charge with the healthcare provider, which in the example opposing counsel has been using is the fee charged by the chiropractor. So if those are the plan requirements, then wouldn't Aetna have had to separately bargain with Mars for some arrangement in its fee, as opposed to in effect back charging the plan or the plan participant to pay a higher rate than the plan appeared to set? No, I don't believe so, because we were authorized by Mars and we were asked by Mars to create a network. We saw a hole in our network for this particular service. Our network was too expensive, it didn't have enough doctors. We negotiated with optum a rate that was 25% to 35% lower than the rate for the Aetna network to provide access to those providers. That was a completely reasonable thing for Aetna to do. I should point out that the relationship when Aetna was working with optum on this arrangement, that was not pursuant to any particular specific plan. It was simply putting its network together that would offer them to all of its plans. So that was not acting as a fiduciary when it was negotiated. And there was no evidence from Mars, there was no complaint from Mars that they thought that this was unreasonable relationship. What's ironic about this case is if we had not negotiated this arrangement and we'd used Aetna's network, everyone would have spent more money, there would have been fewer doctors, but apparently this case would have never been filed. It's only because we negotiated with optum for a lower rate that this case has been filed. And Aetna was entitled to a milestone, and they interpreted this plan to put these optum providers in the same position as an Aetna network provider so that they would be available at the cheaper rates to plan participants. And the negotiated charge was the charge that Aetna negotiated for access to that network. There was no evidence there could ever have been any other arrangement. There was no evidence that Aetna could have ever negotiated the agreement that Ms. Peters suggested somehow we should have access at the optum downstream rates. There was no evidence that that was economically feasible. And to the standing question that was asked at the beginning of the hearing, standing, the injury here has sort of two levels. I think the district judge was very generous with Ms. Peters here because he analyzed the injury looking at her own theory and taking her own theory at face value. He said you don't have an injury, and the only difference they had with Ms. Peters is that Ms. Peters was wanting to look at just a handful, sort of cherry pick certain transactions and just look at those and pay no attention to the ones where she actually saved money. The court said even under your own theory, if you look at... Mr. Alston, as to Aetna and the specific violation in this case, how is Aetna a fiduciary? Well, Aetna was not a fiduciary in negotiating with Optum to form this relationship. That was not done with respect to any particular plan. As to administering a plan, it is a fiduciary in administering a plan. But part of the purpose, the central thrust of the plan administrator, claims administrator, is to determine the intent of the plan. And here Aetna classified these providers as network providers, which made them available at preferential... It gave the patients access to the most number of doctors at rates that were much less than they would have been under Aetna's plan. And that's an entirely reasonable interpretation of this plan under the Firestone standard. And I want to look back to standing because I think the district court was generous in saying, Ms. Peters, I'll look at it your way. But really, her argument made no economic sense. There was no economic real-world scenario where Aetna was going to be able to go to Optum. Keep in mind, Optum's a competitor of Aetna's. There was no way that Aetna was going to be able to go to Optum and negotiate for the same rates that Optum was downstream providers. There was no evidence that could have ever happened. So the true measure of damages here is if we had not done that, what would the plan and the participants have paid? And everyone agrees it would have been 25 to 35 percent higher. It would have been the 109 Aetna rate as opposed to the $88 rate that Aetna was able to negotiate. So there's no standing here really by any measure. And it's only because I think the district court said, all right, Ms. Peters, you have a degree at face value. Even in your own theory, you don't have an established damages. And then on the class issues, of course, we would have to go through and look at it and do that same analysis. There are 1,600 PUS plans. We'd have to look at the language of every one of those plans. We'd have to go through every participant. When did they meet their deductible? Is it a family plan? If it is, it's a family deductible. When did they seek the service in the year? Was there still a deductible left at that time? If the deductible had been exhausted, then the plan would pay everything. But you'd have to do that over 80,000 times. And I think under this court's precedence, it was not readily identifiable under objective criteria and the court correctly did not abuse its discretion in denying class certification. Thank you, Mr. Austin. Mr. Boone. Thank you, Your Honor. May it please the court, Brian Boone from Austin and Byrd for Optum. I apologize for my voice. I've got a cold today, or at least I hope it's a cold. I was pleasantly surprised to hear Mr. Hufford concede that Optum shouldn't be held liable. I just wish he would have admitted that before Optum spent millions of dollars defending a meritless litigation. I won't repeat all that you just heard, but I will note that there's been a lot of talk about Sandra Peters, the terms of her former plan, the Mars plan, the contract between the Mars plan and Aetna, and Peters' individual benefits claims. You see the same thing in Peters' briefing on appeal. She focused overwhelmingly on her individual claims and plan terms and not on class issues. That, I think, tells you all you need to know about the strength of her class-related arguments. The arguments are half-hearted for a reason. They're meritless. In denying class certification, the district court got it right on the facts and the law and certainly didn't abuse its discretion. The same is true of the court summary judgment ruling as to Optum. For Optum, the proceedings below played out a little differently. Before the class certification phase, Peters moved to compel discovery under what's known as the fiduciary exception to the attorney-client privilege. She chose to tee up that factual question when she did. The party submitted briefs and evidence and the court held a hearing and then issued an opinion. In that opinion, the court denied Peters' motion and found that Optum served no fiduciary function at all relating to the challenge conduct, which of course is always the question. Peters didn't ask the court to reconsider that ruling and doesn't challenge that ruling on appeal. Instead, in light of that ruling, Peters changed course below. She chose not to seek certification of any fiduciary claim against Optum. In fact, she argued in her class cert briefing that it was undisputed that, quote, Aetna made the challenge benefit determinations and, quote, sent the EOBs related to those claims. That's at JA5009. You heard the same from Mr. Hufford when he was arguing earlier. So, Peters effectively abandoned her fiduciary claims against Optum. Certainly, it seems like on appeal now she's abandoned them altogether. That left only an unpleaded claim for non-fiduciary liability under ERISA section 50283, but that unpleaded claim ran into all the same problems. To get non-fiduciary monetary relief under Harris Trust, each plan member would have needed to prove several different individualized facts, including that Aetna was performing a fiduciary role when making the challenge benefit determinations, that Aetna breached the fiduciary duty in making those determinations, that Optum knew that Aetna breached the fiduciary duty to the plan in question, that the plan member suffered some concrete injury, that Optum, in fact, made a profit on the member's benefit claims for that particular plan year, that the member could trace some property or profit to Optum, and that it would be inequitable to allow Optum to keep that traceable profit. In other words, that the profit was ill-gotten. All of those questions required individualized answers. They defied common proof. If we can take Sandra Peters as an example, analyzing her non-fiduciary claim against Optum required looking at her individual claims history, the terms of her plan, Aetna's course of dealing and contract with the Mars plan, whether Optum had a relationship with the Mars plan, it didn't, and what Optum knew, if anything, about the Mars plan. In fact, it had never seen the plan. It also required analyzing whether Optum earned any profit on Peters' benefit claims. In Peters' case, Optum made only $22 on the 32 claims for which she sought damages. It made only a total of $1.8 million under the Aetna-Optum contract over the whole span of five years. That, by the way, is less than what it spent on this litigation. All of that Peters-specific analysis that I just went through is for just one former plan member from one plan. You'd need to do the same thing for each of the 80,000-plus people in the proposed classes. This wasn't a class action. It was thousands upon thousands of mini-trials waiting to happen. There were other problems with the non-fiduciary claim against Optum. Peters couldn't trace any payment to Optum because she never paid Optum. She paid Optum's downstream providers, and the Mars plan didn't pay Optum either. Aetna did. Aetna's payments to Optum weren't specific to any plan or member, but instead went into a general Optum bank account, not exclusive to the Aetna-Optum relationship. You also see in the briefing that Peters cherry-picked a couple of emails from Optum employee David Elton who expressed some concern, what I would call customer service concern, about provider-member confusion. But Dr. Elton wasn't interpreting the Aetna plans. He had never seen the Aetna plans. In fact, no one at Optum ever saw the Aetna plans. No, Dr. Elton was focused on customer service issues. In the same emails, and Mr. Hubbard didn't point this out, Dr. Elton agreed that without the Aetna-Optum contracts, Aetna plans and members would be paying more. Optum always believed, correctly, as it turns out, that the contracts saved Aetna plans and members money. Optum had no reason to think that Aetna was breaching a fiduciary duty to any plan. Peters also plucked out of the record a few emails offhandedly describing the fee structure as burying Optum's administrative fees in the claims process, but witnesses explained that buried meant only that Aetna required that Optum build its administrative fee into the claims process. Peters ignores all of the evidence, the scores of evidence in the record confirming that everybody involved believed that the Aetna-Optum contracts were saving money for Aetna plans and members. No one was trying to cheat anyone out of anything. There's also been a lot of argument today about whether Optum is a healthcare provider. It is. It provides healthcare services. That's what it does. All healthcare services involve administrative costs. Even Peters' proposed expert, Dr. Pantus, agreed with that fact. To give one example, no one would argue that a medical group isn't a healthcare provider, even though the group itself, the legal entity, doesn't sit in the exam room with the patient. Peters wants to define healthcare provider to mean only attending physician, but that's an unnatural reading, or an unnatural interpretation of the definition. You see accepted definitions in the record at JA 2860, Mosby's Medical Dictionary, which defines healthcare provider as an individual institution or agency that provides healthcare services to healthcare consumers. That covers Optum. The other thing that I'd say, and of course this is Aetna's interpretation of the plan, not Optum's, the AMA can have its definition of provider. Peters can have her definition. Optum could even have its definition. I can have my definition. The court could have its definition. But the Mars plan vested Aetna with discretion to interpret the plan, so the only question is whether Aetna's interpretation was reasonable. And you'd have to go through that same analysis thousands of times to analyze whether Aetna breached the duty to any of the more than 1,600 different plans in the record. And with that, I'll have no further comment. Thank you. All right. Thank you, Mr. Boone. Mr. Hufford, you've got some time in rebuttal. Thank you, Your Honor. Both counsel for the defendants continue to stress that there's a good thing for Aetna to have contracted with Optum because Aetna was able to get a reduced price for chiropractic and PC services. And that's fine. We do not challenge that contract. It's not an issue in dispute. We're not saying they did anything wrong. In fact, it's appropriate for Aetna to do that. The question is, who should be paying for that cost, and did Aetna, working with Optum, deliberately mislead the plan and the beneficiaries in violation of ERISA and the fiduciary duties? There's one document I'd like to highlight in the Joint Appendix of JA-2692. This is a 2016 memo from an Optum employee when it's describing the process, and it says, quote, one of Aetna's original goals of the service model design with Optum was to bury the administrative fee within the claims process to ensure Aetna did not have to pay a PM-PM administrative fee out of their own bank account. Now that really says it all. This is not a question of whether Aetna could go out as part of its claims administrative duties and subcontract something to help save money and to help find a better network, which it was obligated to do and was being paid to do. The question is whether Aetna can lie about what it's doing, can treat an administrative fee for Optum as if it's a medical expense, can use an actual CPT code falsely to characterize the Optum fee as a medical expense, and then pass that on to the plans and the members. They cannot explain that or justify that, and they didn't even try. Ultimately, this is an ERISA case. It comes down not to some but-for world of what would happen if they hadn't contracted with Optum, which is really a concept from an antitrust case, but it's an ERISA case. The central basis for the district court's decision here was finding that Optum could probably be deemed to be a network provider because the plan terms limit benefits to being no more than the negotiated charge of a network provider. The only way Aetna could treat Optum and to treat the Optum fee as a benefit above the negotiated charge of the actual treating provider is if Optum was a network provider. In reaching the decision of the district court, it did not apply the Booth or Helton analysis to see whether Aetna properly evaluated the terms. The court didn't even look at the plan terms. It simply said, well, Optum's a network provider since, quote, it provided the network of therapists to Aetna members. Yet, Optum, under that scenario, Aetna's a network provider because under its agreement with the plans, it was providing the network to the plans. Of course, Aetna can't treat its own administrative fee as a medical expense. That's absurd. If, in fact, if you actually look at the plan terms, it's eminently clear that network provider is a healthcare provider. Network provider is defined as a healthcare provider included in the directory as a network provider. Then throughout the plan, it makes clear, for example, by defining providers as healthcare professionals who are properly licensed or certified to provide medical care. The plan also says it doesn't cover treatments not prescribed by a physician. That's the only way you get to benefits is what a professional provider would actually treat. That could be the treating provider or a facility or the person overseeing that provider. That's not what Optum does. It's not licensed to provide medical care. It doesn't treat the patients. It doesn't provide any care at all. It is a vendor, a third-party vendor. As I mentioned previously, I think this is really critical. At JA3063, the MARS plan defines Aetna as Aetna Life Insurance Company and affiliate or a third-party vendor under contract with Aetna. Optum is actually part of Aetna for purposes of the plan. It cannot be treated reasonably as a network provider. Now, I would like to focus one thing on what Optum tried to say in arguing that they're not a fiduciary, etc. Our argument is Optum, again, they don't have to be liable to be able to get the remedy of disgorgement from Aetna here. But Optum was a full participant. It knew what was happening. It knew its administrative fee was being treated as a medical expense. It knew that Aetna was going to use that to pass along the administrative fee. And, of course, Optum knew it was being paid by the plans. So it was a full knowledge participant here. But the final point is, I think, on class certification. The defendants try to characterize this as being this complicated issue. You have to look at whether every plan member in the but-for world would have benefited if Aetna had not contracted with Optum. But that's not the question. Every class member here was treated in the exact same way. Aetna took the administrative fee of Optum, mischaracterized it as a medical expense to pass on that cost to the plan and to the beneficiaries, every class member. All of those people can be easily ascertained from Aetna's own information. All of that information can be identified on a class-wide basis to determine how much money Aetna saved by not having to pay out of its own assets for the administrative fee. This is a very simple case, and there is deception here by Aetna and Optum. They lied by mischaracterizing this to the plans. This is not a contractual issue. It's a deception and a breach of duty. And I think the court clearly got wrong below, both in denying class certification and in granting some of the judgments. I ask there be a reversal. All right. Thank you, Mr. Hufford. On behalf of the panel, I want to thank all counsel for their argument today. I'm going to also thank our courtroom deputy, Emily, and Mike Dean for his technical assistance. And I'll ask the clerk now to adjourn court, and then the judges will reconvene here shortly. By video. Thank you. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: G. Steven Agee, Henry F. Floyd, Stephanie D. Thacker